SOPER *v.* MCELWAINE.

4-7093                                          177 S. W. 2d 424

Opinion delivered December 13, 1943.

*J. S. McConnell* and *Arnold & Arnold,* for appellant.

*House, Moses & Holmes* and *Alfred Featherston,* for appellee.

GRIFFIN SMITH, Chief Justice. R. J. Soper has appealed from the Court's refusal to include Arkansas Quicksilver Mines, Inc., in a judgment for $9,180.61 rendered against R. B. McElwaine, an alternative prayer having been that in the event the mining corporation should not be held liable with McElwaine it should be made to respond in damages for conversion. Incidental matters are involved.

Soper, a resident of Wichita, Kansas, went to Pike County, Arkansas, and in June, 1934, became interested in mining cinnabar and extracting mercury, popularly called quicksilver. The so-called Caponetto lease, embracing 120 acres, became a seat of operations.

By contract of May 5, 1937, certain rights held by McElwaine were conditionally given Soper. McElwaine represented that he was owner of the Caponetto lease, executed April 20, 1937. Soper had supplied McElwaine funds and other things of value in connection with the lease. Valley Mining Company was to be incorporated to exploit the property. McElwaine owed E. P. Seymour $5,000,[1] which the property should secure. It was contemplated that the Seymour obligation should be a lien or mortgage on the lease and equipment; also on the earnings.

Subject to Seymour's rights, Soper might purchase, within three years, an undivided half interest in the lease, the option to be exercised only if Soper should tender to McElwaine $250 cash.[2] McElwaine was, at the time he contracted with Soper, negotiating with Fred McClerkin, of Washington, D. C. There were reservations, as shown in the margin.[3]

As expressed in the Soper-McElwaine agreement, Valley was to assume total indebtedness of $7,100 as of April 20, 1937.[4] Half of Valley stock was to go to Mc-

---

[1] Seymour, a resident of Hutchinson, Kansas, was McElwaine's uncle. [The decree recites that Soper "came into the deal" by purchasing the interest owned by Gene Holmes in the Caponetto lease, then owned by Holmes and McElwaine. A new lease, as required by Soper, was then drawn.]

[2] During the three-year option period, half of the net proceeds, referred to as "earnings from the lease, either by rentals, sale, overriding royalties or otherwise," were payable to Soper.

[3] "Both parties hereto agree that an option to purchase the said mining lease and the present assets in form of mining equipment thereon shall be executed by [McElwaine] in favor of Fred McClerkin, . . . permitting said McClerkin to purchase the said lease and assets at any time prior to July 31, 1937, for a consideration of $17,500. The rights of said McClerkin shall be recognized by [Soper] in case he exercises his right to purchase the undivided half interest in said lease while McClerkin's option is still in effect."

[4] The item of $7,100 included McElwaine's indebtedness to Seymour, "also any indebtedness incurred in the operation of the said lease subsequent [to April 20, 1937]. Whatever rentals or overriding royalties may be due from Valley Mining Company shall be payable only after its other obligations are fully paid."

Elwaine, the remaining half being subject to directions of Soper for issuance to himself or associates. Subject to McClerkin's option, Soper might acquire the total mining lease from McElwaine December 31, 1937, or at any prior time. If Soper elected to purchase for $9,000 the transaction would include McElwaine's fifty percent of Valley stock, ''less one-half of indebtedness then owed by said . . . Company.'' [5]

McElwaine agreed to pay the fee owner any sums that might be due if he assigned the lease, either in whole or in part.[6] Soper was to supply a minimum of $2,000 in cash or necessary credit in order that additional equipment might be installed by Valley.[7]

McElwaine's obligation to Seymour became payable in 1938. A final reservation was that Soper's option ''to purchase the mining lease and one-half of the capital stock of Valley Mining Company from [McElwaine] shall not become operative nor in effect at any time prior to thirty days above maturity date of the $5,000 obligation due to E. P. Seymour.'' [8]

McClerkin did not exercise his option to purchase.

[5] ''. . . cost of any permanent mining equipment added by Valley Mining Company subsequent to this date shall not be figured as an indebtedness of said company for purposes of making settlement, in case this option is exercised.''

[6] A further condition was: ''Whatever sums of money may be due at any time from Valley Mining Company to [McElwaine] or his associates, or to [Soper] or his associates shall draw interest at the rate of six percent per annum, interest payable quarterly, or to be added to unpaid principle.''

[7] Relationship of the parties is reflected by three paragraphs in the contract (here consolidated): ''Present items that have been advanced by [Soper] to [McElwaine] that shall become [obligations] of the Valley Mining Company include $1,500 . . . applied on the $7,100 indebtedness as of April 20, 1937, . . . [and] $150 for purchase of fuel for pumping water and expense of timbering shaft.''

[8] A part of the same reservation was: ''And in case funds shall be available for the Valley Mining Company to pay the said indebtedness, when due, or in event said Seymour shall grant an additional extension or renewal for one year of any portion of the obligation remaining unpaid at its maturity, then this option of purchase granted to [Soper] in the final paragraph of the preceding page shall never have any force or effect.'' [The stenographer, in copying, seemingly did not follow typographical arrangement of the original lease. As presented in the transcript, ''final paragraph of the preceding page'' refers to the item of $150 ''for purpose of fuel for pumping water and expense of timbering shaft.'']

July 8, 1938, Soper contracted with George W. Potter, of Miami, Oklahoma. Certain Soper investments, represented by his option to purchase from McElwaine, were mentioned. [9] Potter, anxious to begin operations on the Caponetto lease, involving use of Valley equipment, and desiring an option to purchase all of Soper's lease interest and his interest in the Valley, together with an option to purchase or effect payment of the Castholm notes, (mentioned in the ninth footnote) had written into the contract an option to purchase from Soper the assets and obligations mentioned, such right to continue four years, if all agreements and stipulations in the contract were strictly complied with.

Total purchase price was fixed at $10,000, with interest from date at five percent, interest payable semi-annually during life of the option. Should the option be terminated before July 8, 1942, Soper should have notice for thirty days before abandonment, and accrued interest was payable to the date of termination.

While the contract continued Soper should be paid "a percentage" of the value of quicksilver produced from the lease, these payments to apply on purchase price.[10]

Pending performance of the contract—that is, prior to exercise of the option—all "custom milling" of ore taken from the lease was to be processed by Mid-Continent Quicksilver Corporation.[11]

Soper guaranteed to protect Potter and his assigns against foreclosure or other interference by reason of the Castholm notes. Should Potter decide to terminate the option before expiration of four years, notice for

[9] These "investments" are spoken of as an undivided half interest in the Caponetto lease, half of the capital stock of Valley Mining Company, ". . . and further represented by certain interests in connection with two equipment vendor's lien notes now of record given by Valley Mining Company in favor of Pete Castholm."

[10] A schedule of percentages was written into the contract.

[11] A proviso was that custom milling of the ore should be given to Mid-Continent if the price did not exceed $3.50 per ton, "as provided in one present contract between Valley Mining Company and the Mid-Continent Quicksilver Corporation," but "This shall not be a bar to prevent [Potter] or his assigns from milling the ore in any plant that they may erect or acquire after this date." [Mid-Continent subsequently went into bankruptcy.]

thirty days was requisite. In that event equipment of Valley Mining Company was to be returned by Potter in as good operation condition "as is shown by the inventory at time such equipment is received from Valley Mining Company." [12] There was a commitment by Potter to comply with all terms of the lease from Caponetto to McElwaine, to the end that the lease should not become in default.

When asked as a witness whether Seymour and McElwaine knew of the contract, Soper replied, "Yes, it was executed by all of us." McElwaine testified that Soper failed to tender to him the item of $250 "in fulfillment of the option of May 5, 1937"; nor had payment been waived. In February or March before his option expired in May, McElwaine notified Soper that if he wanted "the whole thing back," he could have it.

Potter was president of Magnolia Mercury Company, a corporation he apparently organized. It appears to have been controlled by him. Stock was sold to raise new money for mining purposes.

Arkansas Quicksilver Mines, Inc., was chartered October 26, 1939. December 28 of the same year McElwaine, designating himself "owner of [a] certain mining lease on 120 acres," assigned to the new corporation (hereinafter referred to in this opinion as Arkansas) his interest in the lease and equipment. A contemporaneous memorandum explained that the assignment was subject to rights of Magnolia and to the rights of Soper and McElwaine under contract. It was then recited that Arkansas, by accepting the assignment, did not assume liability to Magnolia or Soper, ". . . but in the event [Soper] elects to exercise [the option of May 5, 1937] and tenders to R. B. McElwaine $250 in cash, [Arkansas] agrees to pay McElwaine $250, which payment will make a total of $500 due and to be paid [Caponetto] for sale of the lease. . . ."

---

[12] A paragraph in the contract is: "In case the other obligations of [Potter] or assigns in connection with this contract have been fully complied with, [he] or his assigns shall be permitted to remove whatever equipment they may have furnished for operation of the said Caponetto lease."

The final decree of September 14, 1942,[13] found that Soper advanced the money and furnished equipment called for by his contract with McElwaine. Valley Mining Company, says the decree, was organized by Soper and McElwaine. When Valley became financially involved, McElwaine undertook to assist Soper in selling his interest in the property. With "knowledge, consent, and approval of all parties," Soper (July 8, 1938) sold and conveyed to Potter his option covering the lease, and the equipment located thereon. By action of August 18, 1938, Potter assigned the Soper option to Magnolia. Magnolia, by proper resolution in 1939, authorized Potter (its president) to assign the Soper-Magnolia option.[14] March 13, 1939, all stockholders of Magnolia assigned their certificates to McElwaine. These were delivered to Potter as agent. Potter, in turn, agreed with McElwaine that the certificates were to be placed with Alfred Featherston in escrow, delivery to be made to McElwaine when McElwaine had complied with terms of the agreement. McElwaine defaulted and the stock was not delivered. In spite of McElwaine's default, physical properties, including the lease and equipment, were delivered to him. He was recognized as owner and so treated "by all parties." The decree adjudged that McElwaine should pay Soper any balance due on the $10,000 Potter note, Soper to be relieved of liability for payment of $250 on the Caponetto lease. [McElwaine has not appealed.]

There is an express finding that McElwaine became owner of the property, but thereafter "entered into some kind of a contract" with Leo Yount. McElwaine and Yount organized Arkansas Quicksilver, and ". . . certain property included in the original option" was taken over by Arkansas. This defendant was adjudged liable for machinery converted to its use. The significant finding was made:

---

[13] One decree was rendered December 19, 1940, and another May 12, 1941, the cause having been reopened. Extreme care and patience upon the part of the Chancellor are shown by the indulgence extended.

[14] This option conferred upon Magnolia the right to purchase Soper's interest in Valley.

"After consideration of all the options, sales, contracts, and correspondence between McElwaine and Soper, [they] all amount to a sale by Soper to McElwaine, and McElwaine is indebted to Soper for $10,000, less payments shown by the proof to have been made."

Value of the machinery wrongfully held by Arkansas was fixed at $135. Certain enumerated items of equipment delivered by McElwaine to Arkansas was under mortgage to Seymour, who was not a party to the suit, but who, nevertheless, was in possession through legal title. Seymour was also entitled to "all other tools on the Caponetto lease when the mortgage was given."

Under terms of the Soper-Potter option, says the decree, machinery added by Potter was subject to removal upon termination of Potter's rights under the contract of July 8, 1938. Arkansas purchased, for $1,675, certain equipment not itemized. Part of the payment was made under order of the Pike Chancery Court in an action by Allen's Cash Store v. F. M. McRae, Executor of the Estate of George W. Potter, Deceased, wherein Arkansas Quicksilver Mines, Inc., was garnishee. In the instant decree the Court held that by its purchase in the former case Arkansas acquired title superior to Soper's claim. In a suit by Fagan Electric Company v. Valley Mining Company, (Pike Circuit) the Fagan Company obtained judgment. Certain property was sold on execution and bought by Arkansas. Its title was declared superior to that of Soper in a suit by Pete Castholm in Pike Circuit Court. Arkansas was defendant. The decree states that Soper filed pleadings and testified.

An Alice Chalmers motor, alleged by Soper to be worth $1,500, and thought to have been converted by Arkansas, was (according to the decree) on the Caponetto lease, but was not claimed by Arkansas. The right of possession as between Arkansas and Soper was adjudged to be in the latter.

### OTHER FACTS—AND OPINION

Appellant thinks the Court erred in refusing to hold Arkansas liable on the ground that it was a continuation

of operations by McElwaine and Yount. These men, it is insisted, caused Arkansas to be incorporated, and were in sequence to Potter and Magnolia. Arkansas is alleged to have acted fraudulently, and therefore should be held with McElwaine. An ingredient of the fraud is that after operating the mine two months—October to December 28 —Arkansas was satisfied with results to such an extent that it secured a written assignment; then, according to the argument, "it got over on [the International] Paper Company's land and forfeited the lease by not paying $500 due the fee owner, . . . [then later] junked and converted the property."

Appellant's theory would be correct if there were an unconditional obligation; or, if by reason of conduct subsequently engaged in, an equitable obligation arose. What appellant had in mind in respect of rights arising under the contracts between Soper and McElwaine (May 5, 1937) and Potter and Soper (July 8, 1938) is shown by statements to the Court by one of appellant's attorneys:

"The interests on which Soper bases his rights are [conferred] by the two contracts. . . . Naturally, Potter's contract was known to McElwaine because he witnessed it. McElwaine became a party to that contract when he assumed the obligations—when he purchased it from Potter. Until McElwaine purchased from Potter (it is conceded) we would not have ground to stand on, but after he purchased and assumed obligations [of the Soper-McElwaine contract] we cannot throw one contract away when there was another which superseded and bound McElwaine until 1942. . . . Why should [Soper] pay McElwaine $250 when he had a contract with McElwaine—which he had purchased from Potter— to carry out the obligations of this contract?"

Language of the agreement in question is not susceptible of the construction that there was a present sale. That is negatived by the contractual statement that Potter desired an *option* to purchase Soper's interest in the lease and in Valley Mining Company, ". . . total price to be $10,000, . . . and in case this option should be terminated at any time before July 8, 1942," thirty days notice should be given. This notice did not

affect the right to buy—that is, to exercise the option—but went only to the right to terminate. This, of course, could be waived.

If Arkansas is to be held liable, then it must be assumed that the McElwaine assignment of December 28th carried with it consent by Arkansas to stand in McElwaine's position and in the position of his assignors, in respect of obligations, and that for all practical purposes the corporation, from that time, was the recipient of benefits expressed and implied. If it be said that the assignment (which the evidence shows was recorded through error) was sufficient to bind Arkansas, uncontradicted evidence is that another writing of the same date, which must be regarded as contemporaneous and to be construed with the assignment, recognized that it was subject to Magnolia and Soper's interests ". . . under their contracts and agreements heretofore made."

There is an intimation in appellant's argument that this explanatory writing was not, in fact, executed on the 28th of December, 1939. However, the Chancellor, on sufficient evidence, seems to have found against this belief.

Transcript on appeal contains more than 400 pages, the record alone covering 54. Transactions disclosed by exhibits and the testimony are highly involved, net result being that operations were not profitable and that those concerned were endeavoring as expeditiously as possible to extricate themselves from situations where liability would attach.[15]

Much of the testimony upon which the Chancellor acted was given orally. The trial occurred in a county wherein cinnabar mining and the extraction of mercury are extensively carried on. The Court weighed all evi-

---

[15] An example of McElwaine's position is reflected in a letter from his uncle, E. P. Seymour, dated June 8, 1937. Seymour mentioned a visit from Soper, and said: "He is hard for me to figure out, and he ties everything up in such a complicated way that I would believe he is trying to put everything in pretty much of a snarl. . . . He showed me Yount's letter regarding [actions of Caponetto in] trying to avoid the lease. . . . I wish Soper was an easier man to work with and that I wasn't quite so suspicious of him. He is very smart and capable, and ruthless in his way of operating. . . . ."

dence and found that it preponderated in favor of appellees in respect of the issues decided in their favor. Appellant has not shown error; hence the decree must be affirmed. It is so ordered.